Filed 7/7/16  In re Gage R. CA5
Received for posting 7/8/16

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re GAGE R., a Person Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES/CHILD WELFARE SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>P.S.,<br><br>Defendant and Appellant. | F072550<br><br>(Super. Ct. No. MJP017211)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from orders of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas W. Nelson, County Counsel, and Miranda Neal, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Kane, J. and Franson, J.

Appellant P.S. (mother) appeals from the juvenile court's final custody and visitation orders under Welfare and Institutions Code section 362.4[1] as to her now four-year-old son Gage. Mother contends the juvenile court erred by denying her visitation. We affirm.

### PROCEDUAL AND FACTUAL SUMMARY

Mother and Marty R. (father), Gage's biological parents, have a very contentious relationship stemming from father's marriage to Terrie. Mother found out father was married to Terrie a month after Gage was born. She subsequently prohibited father from visiting Gage and initiated custody proceedings. Mother and father's volatile relationship was exacerbated by a restraining order that mother obtained against Terrie and mother and father's dispute as to whether Gage should be circumcised. Their animosity toward each other manifested whenever they were required to have contact, such as when exchanging Gage for visitation and taking Gage to medical appointments. They shared equal custody of Gage but Gage lived primarily with mother.

In June 2013, the Madera County Department of Social Services (department) met with mother and father to discuss their ongoing accusations of neglect and physical and emotional abuse against one another over the previous six months. Mother and father were thoroughly checking Gage's body for bruises or marks upon his return from visits and accusing each other of neglect and not communicating with the other on Gage's behalf. They were also reporting each other to law enforcement for physical abuse. Gage was exhibiting aggressive behavior after visits such as biting, pinching, and hitting.

In August 2013, the department filed a dependency petition on Gage's behalf, alleging mother and father's volatile relationship placed Gage at a substantial risk of suffering serious physical and emotional harm. (§ 300, subds. (b) & (c).) The department did not take Gage into protective custody.

---

[1] All statutory references are to the Welfare and Institutions Code.

2

The juvenile court found prima facie evidence that Gage was subject to its dependency jurisdiction as alleged in the petition. The court ordered that Gage remain in his parents' custody. Several days later, during his visitation, father informed mother by email that Gage had a "blood blister" on his penis. Mother demanded that he take Gage to his regular pediatrician immediately and to let her know when they arrived so she could be present during his appointment as ordered by the family court. Instead, father took Gage to the doctor two days later and did not notify her. During their exchange of Gage at the police station, mother inspected Gage's penis in the restroom and saw what appeared to be red and purple discoloration on his foreskin. She notified one of the officers who took a report and photographed Gage's penis. Two days later, mother took Gage to his pediatrician who determined that Gage had bruised foreskin and that he did not have a viral infection of his penis. Mother was concerned that she had to turn Gage over to father for a visit and contacted the social worker. When she was unable to get in touch with the social worker, she took Gage to the department office. The social worker conferred with mother and with father and Terrie separately and told mother she had to release Gage for visitation. A supervisor contacted Gage's pediatrician, Dr. Naz, who was unable to conclusively state that the bruise was physical abuse.

Dr. Naz addressed the issue of Gage's uncircumcised penis in a letter, stating he had evaluated Gage multiple times for irritated penile foreskin. It was a contentious matter for the parents; father wanted him circumcised and mother did not. Dr. Naz recommended circumcision to them at birth but it was not performed. As a result, Gage had multiple episodes of balanitis (irritation and inflammation) of the foreskin and had been seen in his office, the emergency room, and by another physician who also recommended circumcision. He said he had explained to mother and father numerous times how to take care of an uncircumcised boy.

In October 2013, the juvenile court convened a contested jurisdictional hearing on the petition filed in August 2013. The court heard testimony and continued the hearing

3

until December 19, 2013. Meanwhile, on December 12, 2013, at approximately 8:30 a.m., mother took Gage to the department office for the visitation exchange with father. Gage started whimpering when social worker Vilma Dunn told him that he was going with father. He started crying even more when father took him. Father told Dunn that mother drove by his home several times and accused Terrie of hurting someone. Law enforcement interviewed Terrie and she was afraid she was going to be charged with a crime. Father said he did not want the court or the department involved but he did not know what to do anymore. He became emotional and said that mother acted one way around the court and social worker but was totally different when no one was around. He suspected that mother was medicating Gage before his visits with father because Gage's behavior had changed. He also suspected that mother was showing Gage pictures of him and Terrie because Gage was afraid of Terrie.

Approximately 20 minutes after father left the office with Gage, he called Dunn and said that Gage had bruising in his ears, a cut behind his ear and under his eye, and his eyelashes had been cut. Dunn directed father to return Gage to the office and to take him to have a hair follicle test for drugs and possible over-the-counter medication. When Dunn turned Gage over to mother, mother cried and stated she had not harmed Gage and stated father "did it and he is evil." Mother kept asking Gage, "Who did it? Gage, who did this to you!?" Dunn instructed mother to stop questioning Gage.

The following day, the department received a report of possible child abuse from a hospital social worker. Mother had taken Gage to the emergency room where a physician determined that his injury was "inflicted" and "non-accidental." Gage had a bone scan, which was normal, but he had multiple bruises at different stages of healing. Mother accused father of injuring Gage during his visit the day before. She said father had a history of pulling children's ears and of drug use, including cocaine, steroids, and marijuana. The police were contacted and a protective hold was placed on Gage. The department placed Gage in foster care.

4

Dr. Philip Hyden, medical director of the Child Advocacy Clinic at Childrens Hospital of Central California, evaluated Gage in the emergency room. He stated that Gage's ears had been "boxed" and that someone cut Gage's eyelashes and that he had abrasions near his left eye that were probably sustained when his eyelashes were being cut. He said whoever cut his eyelashes was "sadistic."

On December 17, 2013, Dunn was notified that Gage tested positive for methamphetamine at a rate in excess of the adult cutoff level. Mother and father also submitted to hair follicle testing and tested negative for drugs.

The department filed an amended petition, alleging Gage suffered serious physical harm inflicted by one or both of his parents and they had no reasonable explanation for his injuries. The petition also alleged that Gage was at risk of suffering serious physical harm as a result of their volatile relationship. (§ 300, subds. (a), (b) & (c).)

The juvenile court ordered Gage detained on the amended petition and ordered the department to offer mother and father services, including a psychological evaluation. In February 2014, following a contested jurisdictional hearing, the juvenile court found the allegations to be true and set the matter for disposition. Mother and father denied using methamphetamine or exposing Gage to it. They also denied injuring Gage. It was never determined how Gage ingested methamphetamine.

In February 2014, the department filed its report for the dispositional hearing. By that time, the department had placed Gage with father because father was demonstrating appropriate parenting skills while mother was not. According to mother's parenting instructor, mother declined to discipline Gage and allowed him to hit her and his siblings. The department requested that the juvenile court order Gage to be placed in father's custody and that the court provide both parents reunification services.

In March 2014, the juvenile court convened a contested dispositional hearing, which would ultimately conclude in July 2014. During the course of the hearing, the department continued to receive information about the family situation, which it relayed

5

to the court. In March 2014, the department reported that Gage was adversely affected by visiting mother. Father reported that Gage did not want to eat or play and was having a hard time sleeping. He complained that his stomach hurt and he played with his fingers. While with mother, he threw tantrums, pushed her away, and refused to be comforted. In addition, mother persisted in taking pictures of Gage during visits, including taking pictures of his private parts, tummy, and leg while changing him and had to be counseled multiple times to stop. In mid-March 2014, Dunn received a call from Terrie who stated that she and Gage ran into mother at a swap meet. She claimed that mother was following her. Mother, meanwhile, contacted the police, stating that Terrie was following her and violating her restraining order. Dunn responded to the swap meet and noted that Gage appeared to be "shut down" with a flat affect. After this episode, it was decided that mother's visits with Gage would be supervised by Gage's therapist Julia Garcia.

In April 2014, psychologist Robert Taylor reported the findings of his psychological evaluation of mother. He diagnosed her as having a personality disorder with histrionic and narcissistic features. He said her personality disorder significantly compromised her ability to provide a safe and secure emotional environment for Gage. This was manifested by her negativity toward father, near-delusional beliefs about being harassed by father and social workers, passive-aggressive behavior and emotional over-involvement with Gage.

In May 2014, Julia Garcia reported on the progress of Gage's therapeutic visits with mother. She observed that he had significant difficulty emotionally engaging with mother and was often aggressive toward her, throwing toys at her, punching her in the throat and pulling her hair. She did not know where his aggression originated and had not observed the same behavior with father or Terrie. She also observed that he was detached toward mother, which raised questions about their early involvement, especially since mother described it as "good" and "normal."

6

Garcia reported that Gage engaged in rough play with mother, which mother allowed and encouraged. He did not make eye contact with her and played at a distance, often pulling back from her or running from her. He did not hug or kiss her and when he allowed her to pick him up, he pulled her hair and grabbed her neck, wanting to get down right away. He seemed bothered by mother's presence and wanted to leave visits early. During one visit, Gage was having a hard time and became completely disassociated. Father was contacted to physically remove him from the building. Gage hugged father very tightly and took a deep breath. He was able to self-regulate after about 10 minutes. Garcia visited Gage at home the next day. He was taking a nap and appeared to be having sleep disturbances to the point of being physically pale.

In June 2014, Garcia testified that Gage was globally delayed because he was not achieving any of his milestones. After ruling out autism as the cause, Garcia concluded that Gage's delay was the result of trauma that occurred in the first two and a half years of his life. She believed that Gage suffered pediatric posttraumatic stress disorder while in mother's care and she recommended that the court terminate mother's visits.

Garcia further testified that Gage was not attached to mother. His relationship with her was a "'[d]isorganized [a]ttachment,'" which occurs because of pathological care in the first three years of a child's life. She explained that pathological care was neglect or trauma based on sexual or physical abuse. Gage's reactions after visits with mother were the result of him being exposed to the origin of his trauma. She believed that Gage did not show his fear during visits with mother because he was in front of the person who harmed him. Gage then "released that energy" at father's home because he was in a safe place. She said that Gage would indicate who harmed him by his behavior. If father and Terrie had harmed him, he would not exhibit the growth he did in their care. He would behave toward them as he behaved toward mother. She believed father and Terrie should continue to raise Gage. He shared a mutually engaging relationship with them and was thriving in their care.

7

In July 2014, at the conclusion of the contested hearing, the juvenile court declared Gage a dependent child, ordered him removed from mother and placed with father. The court ordered therapeutic visits for mother for one hour twice a week and ordered mother and father to participate in a coparenting class. The court also ordered a psychological evaluation of Gage to determine if he was suffering from any mental health condition and to include, if applicable, a diagnosis and treatment plan.

In a letter dated July 24, 2014, Julia Garcia advised Dunn that Gage could no longer tolerate having visits with mother and that she felt she was harming him by allowing him to be exposed to mother. She related how Gage reacted in fear the moment he arrived at the department building knowing that he would see mother. He cried, pinched himself, and twisted his fingers. He had also begun to employ new maladaptive behaviors such as disassociating or freezing. On July 23, 2014, prior to a visit, he cried hysterically and then physically withdrew, appearing to fall asleep. He went into a "freeze" stance and dissociated, casting his eyes down and assuming a flat affect. His body became rigid and he did not respond to Terrie. When mother saw him, she demanded that he be drug tested. Approximately 18 minutes later, Gage came out of his dissociative state and began to engage with mother but at a distance. The following day, during a home visit, Garcia found him engaging and playing with Terrie until Garcia mentioned the word "visit." Immediately, Gage became still, his eyes widened, and his affect became flat, and his body rigid. Garcia stated that if Gage continued to be exposed to mother, he would suffer long-term emotional and behavioral difficulties.

After mother's visit ended, she prevailed upon the department to order a drug test for Gage after involving her attorney and Dr. Hyden. Father took Gage to the emergency room to be drug tested. Mother also went to the emergency room. When Gage saw her he began to cry and then to wail. The on-call social worker at the emergency room stated that Gage appeared terrified of mother and appeared to have wet himself out of fear.

8

Mother was escorted out of the area by security. As soon as she left, Gage immediately calmed down. Gage tested negative for drugs.

The following day, the juvenile court convened a hearing and approved county counsel's request to temporarily suspend mother's visits. The court set a hearing on the department's section 388 petition to terminate mother's visitation.

In August 2014, the juvenile court ordered Dr. Kambam to conduct a psychological evaluation of Gage. The court also approved a case plan and ordered therapeutic visits to resume but for one visit a week. The court conducted a hearing on the section 388 petition and approved a stipulated agreement by the parties regarding mother's therapeutic visits, visits with the maternal grandparents and siblings, and medical appointments. The court set a family maintenance review hearing for November 2014.

In December 2014, Dr. Kambam completed the report of his psychological evaluation of Gage. He diagnosed Gage as having a stress-related disorder related to an unspecific trauma and a language disorder. He opined that Gage had a disordered attachment with mother and it was in Gage's best interest to remain with father and Terrie. He also opined that Gage was at risk of developing a reactive attachment disorder if placed with mother.

In July 2015, mother was arrested for being an accessory to promoting/assisting further felonious acts with a street gang and attempted crime/murder.

In August 2015, the juvenile court conducted a contested family maintenance review hearing. Julia Garcia testified that after Gage no longer had visits with mother or maternal grandparents, he stopped defecating in his pants and hiding under the bed. She said he rode the bus to school and attended a special day preschool. Social worker Maravilla also testified that Gage appeared very different to her when she visited him in his father's home a month before. She said he appeared calm, happy and relaxed, which she attributed to him not seeing mother for approximately a month. She said she was

9

concerned about Gage visiting with mother in light of mother's criminal charges. She discussed her concern with mother who said the police report was "all lies" and part of police corruption. Maravilla recommended that mother's visitation be suspended, that father be granted sole custody of Gage, and that the case be dismissed.

In October 2015, the juvenile court awarded father sole legal and physical custody of Gage. The court did not order visits for mother and set a review hearing in family court for June 2016.

This appeal ensued.

## DISCUSSION

Upon termination of dependency proceedings, the juvenile court may issue "an order determining the custody of, or visitation with, the child." (§ 362.4.) Such orders become part of an existing family court file and remain in effect until they are terminated or modified by the family court. (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) In making a custody or visitation order under section 362.4, the juvenile court must be guided by the totality of the circumstances and issue an order that serves the child's best interests. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.)

A custody or visitation order under section 362.4 is subject to the abuse of discretion standard of review. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) A reviewing court will not disturb a custody or visitation order under section 362.4 unless the juvenile court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Bridget A. v. Superior Court, supra,* at pp. 300-301.)

Mother contends the juvenile court did not consider the totality of the circumstances in deciding not to order visitation for her. Had it done so, she argues, it would have considered the strong bond she and Gage share and would have been compelled to order visitation. We disagree.

10

The juvenile court had compelling evidence from Julia Garcia, who opined that Gage was not bonded to mother but rather had a disordered attachment to her. Dr. Kambam confirmed Garcia's opinion. What made Garcia's opinion compelling was that it was not based on a one-time assessment but on months of working with mother and Gage and observing their interactions. Further, the court was able to indirectly witness Gage's lack of bond with mother and increased aversion to her through the department's reports filed during the course of the dispositional hearing.

Mother argues the juvenile court could not have concluded she and Gage were not bonded if it had more heavily weighed the testimony of Dr. Hyden and her psychologist, Dr. Sommers. Specifically, mother refers to Dr. Hyden's testimony that, during the approximately 30 minutes he spent with Gage, he observed that mother was very appropriate with Gage and that Gage was easily consoled by her. He did not observe anything about their interaction that concerned him. She also refers us to Dr. Sommers's testimony that he believed mother loved Gage and had a strong "tie" to him.

Mother in essence asks this court to reweigh the evidence, which we cannot do. Our role is to determine whether substantial evidence supports the juvenile court's factual findings. As we stated above, there was substantial evidence that Gage was not bonded to mother and that any attachment he had to her was a source of distress. Further, Dr. Hyden did not render an opinion as to mother's bond with Gage and Dr. Sommers's opinion that mother had a strong tie to Gage was based solely on mother's description of her relationship with Gage.

Finally, we find no abuse of discretion in the juvenile court's decision to deny mother visitation. Gage was becoming increasingly distraught as a result of his contact with mother to the point that visitation was emotional damaging to him. Under the circumstances, it was not in his best interest at that time to continue to visit her. We find no error.

11

## DISPOSITION

The juvenile court's orders regarding custody and visitation are affirmed.